# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-8035

NANCY R. MURRAY,

*Plaintiff-Petitioner,*

*v.*

GMAC MORTGAGE CORPORATION,
doing business as Ditech.com,

*Defendant-Respondent.*

Petition for Permission to Appeal from the
United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 1229—**Samuel Der-Yeghiayan**, *Judge.*

SUBMITTED DECEMBER 12, 2005—DECIDED JANUARY 17, 2006

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Shortly after her debts had been discharged in bankruptcy, Nancy Murray received a credit solicitation from GMAC Mortgage, which had learned her name and address by asking credit bureaus to forward information about potential borrowers who met specified criteria. GMACM offered Murray a loan to be secured by a mortgage on her home. Deluged by offers, Murray showed them to a lawyer, who concluded that GMACM had violated the Fair Credit Reporting Act in two ways: first, GMACM had not made the "firm offer of credit" that

is essential when a potential lender accesses someone's credit history without that person's consent, see 15 U.S.C. §1681b(c)(1)(B)(i); second, GMACM's offer did not include a "clear and conspicuous" notice of the recipient's right to close her credit information to all who lacked her prior consent, see 15 U.S.C. §1681m(d)(1)(D). Murray filed suit, proposing to represent a class of about 1.2 million recipients of similar offers from GMACM and demanding statutory damages, which range from $100 to $1,000 per person. See 15 U.S.C. §1681n(a)(1)(A). A recent amendment to the Act abolishes private remedies for violations of the clear-disclosure requirement, which in the future will be enforced administratively, but that change does not apply to offers made before its effective date and thus does not affect this litigation. See 117 Stat. 1952, adding 15 U.S.C. §1681m(h)(8).

While waiting for the judge to decide whether the suit could proceed as a class action, the parties reached a tentative settlement—which the district judge refused to read, stating that this would be a waste of time because he had decided that Murray could not represent a class. See 2005 U.S. Dist. LEXIS 27254 (N.D. Ill. Nov. 8, 2005), reconsideration denied, 2005 U.S. Dist. LEXIS 28249 (Nov. 11, 2005). In an effort to save the availability of class-wide relief, Murray proposes an interlocutory appeal, which we have discretion to allow. See Fed. R. Civ. P. 23(f). GMACM, seeing an opportunity to avoid liability (at least until another recipient of its offer files suit), opposes her petition. Meanwhile another district judge has certified a class in an essentially identical action. See *Murray v. New Cingular Wireless Services, Inc.*, 2005 U.S. Dist. LEXIS 29162 (N.D. Ill. Nov. 17, 2005). We accept the appeal, which presents some fundamental questions about the management of consumer class actions, in light of this conflict and the fact that about two score more of these suits are pending in the Northern District of Illinois. Because the

papers already filed cover the issues fully, we proceed directly to decision.

The district court gave four reasons for declining to certify a class: (1) Counsel did not try to cut a deal for Murray personally. (2) The complaint seeks statutory but not compensatory damages. (3) Statutory damages, if awarded to a class, would be ruinously high. (4) Nancy Murray is a "professional plaintiff" unfit to represent a class. All but #4 evince hostility to all class litigation; if any one were adopted, consumer class actions under the Fair Credit Reporting Act would be impossible. None is a proper ground on which to deny class certification, however.

**1.** Let us start with the first. The district judge wrote: "Murray's interests are antagonistic to other class members' interests because Murray may desire to settle her claim alone. Murray might be able to recover more funds individually with fewer complications if she settled individually." Yet every plaintiff "may desire" to settle alone; if this were enough to preclude class treatment, there could be no class actions for damages under Rule 23(b)(3). The district judge did not point to any evidence suggesting that Murray *does* want to settle privately; if she did (and her lawyers say, without contradiction from the record, that she doesn't), why launch the suit as a class action? The only answer would be that she wanted to use the class as bait to attract a better offer, then cash in by withdrawing the class claim. If that were her goal (or her lawyer's), it would be unethical, see *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1306 (4th Cir. 1978), as well as unrealistic. For unless the statute of limitations had run (which it hasn't), why would GMACM pay Murray to go away when any of a million other recipients could take her place?

Unfortunately, the terms of the tentative settlement suggest that Murray or her lawyers may have tried something worse, negotiating for payment while giving GMACM the benefit of a judgment that leaves the class empty-

handed. GMACM agreed to put up a fund of $950,000 that would be divided between the class members and their lawyer. Murray would get the first $3,000; the remaining class members (some 380,000 of whom would receive mailed notice) and counsel would divide the rest. That works out to less than $1 per recipient of GMACM's mailing. Money not claimed from the fund—and, given the tiny sum per person, who would bother to mail a claim?— would be distributed to charity and Murray's lawyers.

This looks like the sort of settlement that we condemned in *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999), and *Crawford v. Equifax Payment Services*, 201 F.3d 877 (7th Cir. 2000), two appeals arising from the same litigation. That suit had been settled for $2,000 to the named plaintiff, $5,500 to a legal-aid society that had not been injured by the defendant's conduct, and $78,000 in legal fees. We treated the disproportion—$2,000 for one class member, nothing for the rest—as proof that the class device had been used to obtain leverage for one person's benefit. See also, e.g., *Young v. Higbee Co.*, 324 U.S. 204, 211-14 (1945); *Weiss v. Regal Collections*, 385 F.3d 337, 343-45 (3d Cir. 2004); *Chauteau de Ville Products, Inc. v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 965-67 (2d Cir. 1978). Here the proposed award is $3,000 to the representative while other class members are frozen out. The payment of $3,000 to Murray is three times the statutory maximum, while others don't get even the $100 that the Act specifies as the minimum. Oddly, this is the sort of tactic that the district judge chastised counsel for *not* employing on Murray's behalf.

Such a settlement is untenable. We don't mean by this that all class members must receive $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty. See *In re Mexico Money Transfer Litigation*, 267 F.3d 743 (7th Cir. 2001). But if the reason other class

members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum? And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout. Thus it may well be that Murray is not a good champion, that her law firm (Edelman, Combs, Latturner & Goodwin, LLC) is not an appropriate counsel, or both. But this is the opposite of the district judge's reason (recall that the judge *wanted* Murray to jettison the class for personal benefit), so this consideration cannot sustain the decision.

**2.** The district court's second reason—that Murray should have sought compensatory damages for herself and all class members rather than relying on the statutory-damages remedy—would make consumer class actions impossible. What each person's injury may be is a question that must be resolved one consumer at a time. Although compensatory damages may be awarded to redress negligence, while statutory damages require wilful conduct, introducing the "easier" negligence theory would preclude class treatment. Common questions no longer would predominate, and an effort to determine a million consumers' individual losses would make the suit unmanageable. Yet individual losses, if any, are likely to be small—a modest concern about privacy, a slight chance that information would leak out and lead to identity theft. That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury.

Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. See, e.g., *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344-45

(7th Cir. 1997). Reliance on federal law avoids the complica-tions that can plague multi-state classes under state law, see *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 288 F.3d 1012 (7th Cir. 2002), and society may gain from the deterrent effect of financial awards. The practical alternative to class litigation is punitive damages, not a fusillade of small-stakes claims. See *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003).

Refusing to certify a class because the plaintiff decides not to make the sort of person-specific arguments that render class treatment infeasible would throw away the benefits of consolidated treatment. Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification. When a few class members' injuries prove to be substantial, they may opt out and litigate independently. See *Jefferson v. Ingersoll International, Inc.*, 195 F.3d 894 (7th Cir. 1999). Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether. Cf. *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995).

**3.** Having upbraided Murray for abandoning compensa-tory damages and thus seeking too little, the district judge also rebuked her for seeking too much. He wrote: "If Murray and the proposed class members were to pre-vail at trial, GMAC would face a potential liability in the billions of dollars for purely technical violations of the FCRA . . . Rule 23 is not intended to encourage such abuses of the class action mechanism."

The reason that damages can be substantial, however, does not lie in an "abuse" of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person, 15 U.S.C. §1681n(a)(1)(A), combined with GMACM's

decision to obtain the credit scores of more than a million persons.

Many laws that authorize statutory damages also limit the aggregate award to any class. For example, the Fair Debt Collection Practices Act says that total recovery may not exceed "the lesser of $500,000 or 1 per centum of the net worth of the debt collector". 15 U.S.C. §1692k(a)(2)(B)(ii). The Truth in Lending Act has an identical cap. 15 U.S.C. §1640(a)(2)(B) (substituting "creditor" for "debt collector"). See also 15 U.S.C. §1693m(a)(1)(B), 12 U.S.C. §4010(a)(2)(B), and 12 U.S.C. §4907(a)(2)(B). Other laws, however, lack such upper bounds. See 15 U.S.C. §1679g(a) (Credit Repair Organizations Act); 15 U.S.C. §1667d (Consumer Leasing Act). The Fair Credit Reporting Act is in the cap-free group.

The district judge sought to curtail the aggregate damages for violations he deemed trivial. Yet it is not appropriate to use procedural devices to undermine laws of which a judge disapproves. See *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987); *United States v. Albertini*, 472 U.S. 675, 680 (1985); *Jaskolski v. Daniels*, 427 F.3d 456, 461-64 (7th Cir. 2005). Maybe suits such as this will lead Congress to amend the Fair Credit Reporting Act; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted. An award that would be unconstitutionally excessive may be reduced, see *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), but constitutional limits are best applied after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure. Reducing recoveries by forcing everyone to litigate independently—so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims—has little to recommend it.

**4.** The district judge regarded "Murray, her spouse, and their children [as] . . . professional plaintiffs. GMAC claims that Murray, her spouse, and their children are participants in more than fifty assorted suits seeking compensation for technical violations of the FCRA which are all being handled by the same law firm. Murray does not deny this fact in her reply. This is . . . an indication that Murray and her counsel are merely seeking the 'quick buck' from a class settlement and are not truly interested in vindicating any of the rights of the proposed class members." Murray tells us that she has filed "only" nine suits; her husband and four children filed the rest. Still, the Murrays are in this big time. What the district judge did not explain, though, is why "professional" is a dirty word. It implies experience, if not expertise. The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders. Neither does GMACM.

A person who seeks out opportunities to sue could do so in ways that injure other class members. Consider the investor who buys one share in each of a thousand corporations, hoping that the price of one will plummet and lead to securities litigation. Such a person could be tempted to file suits designed to extract payoffs from the corporation even if the average investor will lose in the process. Congress has responded by insisting that the investors with the largest stakes be allowed to control securities litigation. 15 U.S.C. §78u-4(a)(2)(A). The Fair Credit Reporting Act lacks any restrictions along these lines.

Murray did not accept compensation to put herself in the way of injury—though "testers," who do this in housing and employment litigation, usually are praised rather than vilified. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75 (1982); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Murray just opened the mail as it arrived. She did not

invite any of the offers or entrap any potential creditor into accessing her credit history. Her decision to sue everyone who accessed that credit history without her consent, rather than just a few, does not injure any other potential borrower. Nothing about the frequency of Murray's litigation implies that she is less suited to represent others than is a person who received and sued on but a single offer. Repeat litigants may be better able to monitor the conduct of counsel, who as a practical matter are the class's real champions.

**5.** GMACM asks us to affirm the district judge's order on an alternative ground. One of the contested questions is whether GMACM used credit information to make a "firm offer of credit," which is one of the few permissible purposes for which this information may be secured without the consumer's consent. The statute defines "firm offer of credit" as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a [credit] report on the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. §1681a(*l*). In other words, if a potential lender asks for the name and address of every consumer who, since discharge in bankruptcy, has not defaulted on an auto loan or credit-card payment, then an offer of credit to this consumer is "firm" if it enables every non-defaulting recipient to accept; if, however, the credit agency erred and a given person has indeed defaulted on a loan since the discharge, then credit need not be extended. 15 U.S.C. §1681a(*l*)(2).

According to GMACM, a court cannot know whether a "firm offer of credit" has been made without examining every recipient's circumstances, and the need to do this for 1.2 million people would make class treatment impractical. The statutory definition of "firm offer" does not ask about how consumers *react*, however; it asks what the

offeror has done—what terms have been extended, whether they are honored if a consumer accepts.

GMACM maintains that *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004), changed the focus from the offeror to the recipient and in the process foreclosed any possibility of class litigation under the Fair Credit Reporting Act. We held in *Cole* that a sham offer used to pitch a product rather than extend credit does not meet the statutory definition. A business that obtains consumer credit information and then offers a $1 loan (at 100% daily interest) toward the purchase of a car has not made a "firm offer *of credit*" but has instead used credit histories to identify potential auto buyers. That objective is not allowed under the Fair Credit Reporting Act, we concluded in *Cole*.

To separate the use of credit data to sell products (forbidden) from the use of credit data to make firm offers of credit (allowed), we held, a court must determine whether the offer has value as an extension of credit alone. "A definition of 'firm offer of credit' that does not incorporate the concept of value to the consumer upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through the pre-screening process. From the consumer's perspective, an offer of credit without value is the equivalent of an advertisement or solicitation.*" Id.* at 726-27. To understand "the consumer's perspective," however, a court must hold 1.2 million hearings—or so GMACM contends.

GMACM offered the recipients first-mortgage loans, so that they could draw cash against the equity in their homes. Because the loan could not exceed the unencumbered portion of the property's market price, however, not all consumers would find the opportunity valuable. Some would not have enough equity to justify acceptance; others could conclude that the costs of refinancing (required so that GMACM could hold the senior mortgage) exceed the benefit from drawing additional credit.

We do not read *Cole*, however, to require a consumer-by-consumer evaluation. An offer has value to "the consumer" if it is useful to the *normal* consumer. *Cole*'s objective was to separate *bona fide* offers of credit from advertisements for products and services, determining from "*all* the material conditions that comprise the credit product in question . . . [whether it] was a guise for solicitation rather than a legitimate credit product". *Id*. at 728 (emphasis in original). That depends on the terms of the offer, not on recipients' idiosyncratic circumstances. How else could someone in GMACM's position know whether it was lawful to obtain credit information in the first place?

In order to avoid class certification, GMACM has adopted a position that would make it impossible for any potential lender to know *ex ante* whether it is entitled to obtain credit information. Any recipient could appear, assert that the offer was worthless given his financial circumstances, and obtain damages if not an injunction. Such a rule would cripple the statutory regime by making offers of credit so risky that any prudent, law-abiding firm would have to withdraw from the business. To escape one suit, GMACM would hobble its own operations and those of all others who rely on the firm-offer proviso to the Fair Credit Reporting Act. That would disserve the interests of both lenders and consumers. Nothing in *Cole* requires an offer's value to be assessed *ex post*, and recipient by recipient. To decide whether GMACM has adhered to the statute, a court need only determine whether the four corners of the offer satisfy the statutory definition (as elaborated in *Cole*), and whether the terms are honored when consumers accept. These questions readily may be resolved for a class as a whole.

The decision of the district court is vacated, and the case is remanded for proceedings consistent with this opinion. Circuit Rule 36 will apply on remand. We strongly suggest that the Executive Committee of the Northern District assign all of the Murray family's suits under the

Fair Credit Reporting Act to a single judge, to ensure consistent handling.

A true Copy:

      Teste:

                    _____

                    *Clerk of the United States Court of*
                       *Appeals for the Seventh Circuit*