In the

# United States Court of Appeals

### For the Seventh Circuit

No. 05-3867

THELMA PERRY,

*Plaintiff-Appellant,*

*v.*

FIRST NATIONAL BANK, doing business as
FIRST NATIONAL CREDIT CARD,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 1470—**Robert W. Gettleman**, *Judge.*

ARGUED MAY 10, 2006—DECIDED AUGUST 25, 2006

Before FLAUM, *Chief Judge*, BAUER and EVANS, *Circuit Judges*.

FLAUM, *Chief Judge*.  Plaintiff-Appellant Thelma Perry filed a class action suit against Defendant-Appellee First National Bank, d/b/a First National Credit Card ("First National") under the Fair Credit Reporting Act ("FCRA" or "Act"), 15 U.S.C. § 1681 *et seq*. Perry alleged that the company violated 15 U.S.C. § 1681m(d) by failing to include a clear and conspicuous statement of certain disclosures required under the FCRA.

First National filed a motion for summary judgment. The district court granted First National's motion, finding that

amendments to FCRA had eliminated private rights of action to enforce § 1681m. The district court also granted First National's motion to strike an expert report that Perry attempted to submit in support of her claim.

Perry sought to amend her complaint to allege that First National's offer of credit was a sham, not a firm offer of credit, and that, pursuant to 15 U.S.C. § 1681b(c)(1)(B)(i), First National was prohibited from accessing her consumer credit report. The district court denied Perry's motion to amend, finding that the credit offer was a firm offer and that amending the complaint would be futile.

Perry appeals the grant of summary judgment for First National and the denial of her motion to amend. For the following reasons, we affirm.

## I.  Background

Perry received a credit solicitation mailing from First National, dated February 14, 2005, offering her a pre-approved Visa credit card with a $250 limit. The mailing contained a letter as well as a brochure setting forth the terms and conditions of the offer. One paragraph of the brochure, titled "Fair Credit Report Act Notice" ("Notice") advised recipients in bold letters that "the credit bureau gave us your name and address and indicated that you met our minimum credit criteria," and that "you can tell credit bureaus to stop using your credit information for this purpose." The solicitation letter itself does not specifically refer to the Notice.

Perry did not authorize First National to access her consumer credit report. She alleges that First National accessed her consumer report and used a consumer reporting agency to target certain people, e.g., individuals with poor credit or individuals who recently obtained bankruptcy discharges, for sub-prime credit offers.

Perry alleged in her complaint that First National violated 15 U.S.C. § 1681m(d) by failing to include a "clear and conspicuous" statement of certain disclosures required by the FCRA. Perry tried to introduce the report of Timothy Shanahan ("Shanahan report"), a professor of education at the University of Illinois at Chicago, to support her argument that the Notice was not "clear and conspicuous." The Shanahan report included a "legibility analysis."

The district court found that Perry did not have a statutory right to bring a private cause of action under § 1681m(d), due to a 2003 amendment to the FCRA that eliminated the right to bring such actions. The district court therefore granted summary judgment for First National. The district court also granted First National's motion to strike Shanahan's report, explaining that "[b]ecause no private right of action exists under § 1681m, an evaluation of the Notice is not relevant to the instant case."

Perry also argued that even if her claim under § 1681m(d) could not succeed, she should be allowed to amend her complaint to plead a violation of 15 U.S.C. § 1681b(c)(1)(B)(i). Section 1681b(c)(1)(B)(i) permits a consumer credit agency to furnish a consumer report even though the consumer has not initiated or authorized the release only if the credit or insurance provider is extending the consumer a "firm offer of credit." Perry contends that the credit solicitation was not a firm offer of credit because it was for such a small amount of credit that it was virtually worthless. The district court disagreed and found that Perry could not state a claim under § 1681b(c)(1)(B)(i), because First National's credit offer was a "firm offer of credit." The district court denied Perry's motion to amend, finding that although the minimum amount of credit that First National offered was small, the interest rate was clear, approval was guaranteed, and the credit card did not contain usage limitations.

## II.  Discussion

Our review of the district court's decision on a motion for summary judgment is de novo. *See, e.g.*, *In re Copper Antitrust Litigation*, 436 F.3d 782, 788 (7th Cir. 2006). Summary judgment is appropriate when, taking all of the pleadings and evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "We review a denial of a motion to amend only for an abuse of discretion." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004).

## A.  Private Right of Action To Enforce 15 U.S.C. § 1681m

Perry brought suit to enforce 15 U.S.C. § 1681m(d), relying on the private right of action provisions contained in 15 U.S.C. §§ 1681n and 1681o. The district court dismissed Perry's claim, finding that an amendment to the FCRA had eliminated private rights of action under § 1681m.

Congress amended parts of 15 U.S.C. § 1681m on December 4, 2003, as part of the Fair and Accurate Credit Transactions Act ("FACTA"), Pub. L. 108-159. The question here is whether the newly added §1681m(h)(8) was designed to preclude private enforcement of the entirety of § 1681m, or just § 1681m(h).[1] 15 U.S.C. §1681m(h)(8) provides:

---

[1]  In *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), we stated that FACTA "abolishe[d] private remedies for violations of the clear-disclosure requirement, which in the future will be enforced administratively." *Id.* at 951. Unlike the present

(continued...)

(h) Duties of users in certain credit transactions

. . . .

(8) Enforcement

(A) No civil actions

Sections 1681n and 1681o of this title shall not apply to any failure by any person to comply with *this section.*

(B) Administrative enforcement

*This section* shall be enforced exclusively under section 1681s of this title by the Federal agencies and officials identified in that section.

15 U.S.C. § 1681m(h)(8) (emphasis added).

Perry argues that FACTA only eliminated private rights of action to enforce § 1681m(h), not § 1681m in its entirety. According to Perry, § 1681m(h)(8) is ambiguous on its face. Specifically, Perry argues that the term "section" as used in § 1681m(h)(8) is ambiguous. Perry maintains that we should interpret the phrase "this section" to apply only to subsection 1681m(h).

We cannot accept Perry's interpretation. Instead, we find that the phrase "this section" unambiguously refers to section 1681m as a whole. "Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). As the Supreme Court explained in *Koons*:

---

[1] (...continued)
case, *Murray* concerned a credit solicitation offer made before the effective date of FACTA, *id.*, and the parties did not brief the question at issue here. Thus, as Perry argues, our statement about the effect of FACTA on private remedies was dicta, which is not controlling in this case.

This hierarchy is set forth in drafting manuals prepared by the legislative counsel's offices in the House and the Senate. The House manual provides:

"To the maximum extent practicable, a section should be broken into—

"(A) subsections (starting with (a));

"(B) paragraphs (starting with (1));

"(C) subparagraphs (starting with (A));

"(D) clauses (starting with (i)) . . . . " House Legislative Counsel's Manual on Drafting Style, HLC No. 104-1, p. 24 (1995).

The Senate manual similarly provides:

"A section is subdivided and indented as follows:

"(a) Subsection.—

"(1) Paragraph.—

"(A) Subparagraph.—

"(i) Clause.- "Senate Office of the Legislative Counsel, Legislative Drafting Manual 10 (1997).

*Koons*, 543 U.S. at 60-61 (citation omitted). *Cf. In re Farley Inc.*, 236 F.3d 359, 361-62 (7th Cir. 2000) ("A legislature that chooses language with time-tested effects does not have to narrate those effects in order to achieve them; a statute is not a legal encyclopedia and need not ape one in order to specify the normal consequences of ordinary legal words and phrases.").

Congress used these standard designations in § 1681m. "Section" clearly is used to refer to § 1681m as a whole. For example, in § 1681m(h)(8)(A)—which provides that the private right of action provisions of the FCRA do not apply to violations of "this section"—sections "1681n" and "1681o" are referred to as "Sections." In § 1681m(h)(8)(B)—

which provides that enforcement of "this section" shall be exclusive to certain federal agencies and officials—"1681s" is designated a section. It is only logical to assume, then, that Congress was referring to section 1681m when it used "this section" in § 1681m(h)(8). Subsection 1681m(h) also uses the phrase "this subsection" consistently when referring just to § 1681m(h) and its notice requirements, rather than § 1681m. *See* 15 U.S.C. § 1681m(h)(1), (3), (4), (5), and (6). In this case, the assumption "that Congress intended the same terms used in different parts of the same statute to have the same meaning" weighs heavily in favor of our interpretation of "this section" in § 1681m(h)(8). *Belom v. Nat'l Futures Ass'n*, 284 F.3d 795, 798 (7th Cir. 2002); *see also Firstar Bank, N.A. v. Faul,* 253 F.3d 982, 990 (7th Cir. 2001); *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996).

In a few places, § 1681m uses "section" to refer to a smaller subdivision of the statute than the entire section. However, these uses are entirely clear: the statute specifically says, for example, "section 1681a(k)(1)(A) of this title," or "section 1681a(k)(1)(B) of this title." 15 U.S.C. § 1681m(b)(2)(B); *see also* § 1681m(d)(1), 1681m(d)(2), and 1681m(h)(5)(D). All of the generic uses of the term "section" refer to § 1681m as a whole. *Cf. Murray v. Household Bank (SB), N.A.*, 386 F. Supp. 2d 993, 997 n.4 (N.D. Ill. 2005).

Perry argues that the placement of §1681m(h)(8) within the FCRA demonstrates that it applies only to § 1681m(h). Paragraph (8) is the only part of subsection 1681m(h) that concerns enforcement. According to Perry, if Congress intended §1681m(h)(8) to apply to all of § 1681m, it would have made §1681m(h)(8) into its own subsection, § 1681m(i). We are not persuaded. It was logical for Congress to place §1681m(h)(8) where it did, at the very end of the statute. It is an enforcement provision that applies to the entire preceding section of the statute. It is also the only subdivision of § 1681m that concerns enforcement.

Perry also argues that if we read all references to "this section" in § 1681m(h) to refer to § 1681m as a whole, § 1681m(c) becomes superfluous and redundant because both § 1681m(h)(7) and § 1681m(c) create a "reasonable procedures" defense. Again, we disagree with Perry's reasoning. If we read all the uses of "this section" in § 1681m(h) to mean "subsection," we would have to attach the same meaning to the other references to "this section" in § 1681m. *See Taracorp, Inc.*, 73 F.3d at 744 ("'[W]e assume that the same words mean have the same meaning in a given act[.]"). Two of these references appear in § 1681m(c), which provides, in its entirety, that "No person shall be held liable for any violation of *this section* if he shows by a preponderance of the evidence that at the time of the alleged violation he maintained reasonable procedures to assure compliance with the provisions of *this section*." 15 U.S.C. § 1681m(c) (emphasis added). It would not make sense to interpret these two references to mean "subsection," because § 1681m(c) itself does not contain any rules that can be violated or complied with.

Perry points out another supposed redundancy caused by reading "this section" to mean the entirety of § 1681m: "Section 1681s-2(c)," which was also amended by FACTA, "expressly provides that the private remedies sections, 15 U.S.C. §§ 1681n and 1681o, do not apply to *one portion* of § 1681, namely 15 U.S.C. § 1681m(e), the provision dealing with 'red flagging' of reports affected by identity theft." According to Perry, "Congress would not amend 15 U.S.C. § 1681s-2(c) to exempt § 1681m(e) from private remedies if all of § 1681m were *already* exempt from private remedies by virtue of § 1681m(h)(8)."

Although this argument has appeal, redundancy "does not always produce ambiguity." *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004). A "preference for avoiding surplusage constructions is not absolute." *Id.* "Where there are two ways to read the text"—one that is consistent with the plain meaning of the text but produces surplusage, and another

that avoids surplusage but creates ambiguity in the text—"applying the rule against surplusage is, absent other indications, inappropriate." *Id.* Instead, "[w]e should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Id.* Here, the plain meaning of "this section" is "section 1681m," and we will not abandon this reading to avoid a single instance of surplusage.

Additionally, there is a reasonable explanation for why Congress included a specific exemption from the private remedies provision in 5 U.S.C. § 1681s-2(c). This provision of the FACTA amendment replaced provisions that already included an exemption from the private remedies provision. Specifically, it replaced 5 U.S.C. § 1681s-2(c), which provided that "Sections 1681n and 1681o of this title do not apply to any failure to comply with subsection (a) of this section, except as provided in section 1681s(c)(1)(B) of this title," and § 1681s-2(d), which provided that "Subsection (a) of this section shall be enforced exclusively under section 1681s of this title by the Federal agencies and officials and the State officials identified in that section." Both before and after FACTA amended 5 U.S.C. § 1681s-2(c), it included an exemption from private actions for failure to comply with 5 U.S.C. § 1681s-2(a). FACTA added two new exemptions, for violations of § 1681s-2(e) and § 1681m(e). Both of these provisions establish a duty on the part of the Federal banking agencies, the National Credit Union Administration, and the Commission to establish certain guidelines and prescribe regulations. It was logical for Congress to include the exemption for violations of § 1681s-2(e) in § 1681s-2(c), since both are in the same section, and it was logical for Congress to also include the exemption for violations of § 1681m(e), which is related to § 1681s-2(e).

So far as we are aware, every district court considering this issue—save one—has found that 15 U.S.C. § 1681m(h)(8) bars private enforcement of § 1681m in its entirety. *See, e.g.*, *Bruce v. Grieger's Motor Sales, Inc.*, 422 F. Supp. 2d 988, 990-93 (N.D. Ind. 2006); *Putkowski v. Irwin Home Equity Corp.*, 423 F. Supp. 2d 1053, 1060-62 (N.D. Cal. 2006); *Stavroff v. Gurley Leep Dodge, Inc.*, 413 F. Supp. 2d 962, 963-67 (N.D. Ind. 2006); *Murray v. Cross Country Bank*, 399 F. Supp. 2d 843, 845 (N.D. Ill. 2005); *Murray v. Household Bank (SB), N.A.*, 386 F. Supp. 2d 993, 996-99 (N.D. Ill. 2005); *Bonner v. Home123 Corp.*, No. 2:05-CV-146 PS, 2006 WL 1518974, at *3-6 (N.D. Ind. May 25, 2006); *Cavin v. Home Loan Center, Inc.*, No. 05 C 4987, 2006 WL 1313191, at *7 (N.D. Ill. May 10, 2006); *Harris v. Fletcher Chrysler Prods., Inc.*, No. 1:05-cv-1140-LJM-VSS, 2006 WL 279030, at *1-3 (S.D. Ind. Feb. 2, 2006); *Killingsworth v. Household Bank (SB), N.A.*, No. 05C5729, 2006 WL 250704, at *3-4 (N.D. Ill. Jan. 31, 2006); *Villagran v. Freeway Ford, Ltd.*, No. Civ. A. H-05-2687, 2006 WL 964731, at *1 (S.D. Tex. Jan. 19, 2006); *Tremble v. Town & Country Credit Corp.*, No. 05 C 2625, 2006 WL 163140, at *1-3 (N.D. Ill. Jan. 18, 2006); *Hernandez v. Citifinancial Servs., Inc.*, No. 05 C 2263, 2005 WL 3430858, at *2-6 (N.D. Ill. Dec. 9, 2005); *McCane v. America's Credit Jewelers, Inc.*, No. Civ.A. 05 C 5089, 2005 WL 3299371, at *1-7 (N.D. Ill. Dec. 1, 2005); *Pietras v. Curfin Oldsmobile, Inc.*, No. Civ.A. 05 C 4624, 2005 WL 2897386, at *2-5 (N.D. Ill. Nov. 1, 2005).

Perry has directed our attention to the one case in which a district court decided that "this section" in 15 U.S.C. § 1681m(h)(8) only bars private rights of action to enforce § 1681m(h). In *Barnette v. Brook Road, Inc.*, No. 3:05CV590, 2006 WL 1195913 (E.D. Va. May 3, 2006), the court found significant that section 312(f) of the FACTA amendments provides that "[n]othing in this section, the amendments made by this section, or any other provision of this Act shall be construed to affect any liability under section 616 or 617

of the Fair Credit Reporting Act (15 U.S.C. [§§] 1681n, 1681o) that existed on the day before the date of enactment of this Act." *Barnette*, 2006 WL 1195913, at *4. 15 U.S.C. §§ 1681n and 1681o contain the provisions establishing a private right of action to enforce the FCRA. According to the *Barnette* court, "§ 312(f) dictates that private individuals may still enforce the requirements of § 1681m that antedated FACTA." *Barnette*, 2006 WL 1195913 at *4.

We respectfully disagree with the *Barnette* court's analysis. While section 312(f) of FACTA provides that the amendments shall not "affect any liability" under 15 U.S.C. §§ 1681n and 1681o, it says nothing about who has the right to bring suit to hold responsible parties liable under §§ 1681n and 1681o. Our reading of § 1681m(h)(8) has no effect on First National's potential liability for violations of § 1681m. First National can still be held liable for any violation, but only by the federal agencies and officials identified in 15 U.S.C. § 1681s. *See* 15 U.S.C. § 1681m(h)(8).

In sum, we affirm the district court's decision to dismiss Perry's claim. The unambiguous language of § 1681m(h)(8) demonstrates that Congress intended to preempt private causes of action to enforce § 1681m. Because "[o]ur inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" we will not consider Perry's arguments regarding the legislative history of FACTA. *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 711 (7th Cir. 2005) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989))). We note, however, that the legislative history of FACTA is silent on the question of whether Congress intended to preclude private rights of action to enforce the entirety of § 1681m. "An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *United States v. Rivera*, 153 F.3d 809, 812 (7th Cir. 1998) (quoting *Burns*

*v. United States*, 501 U.S. 129, 136 (1991)) (internal quotation marks omitted). Finally, we find that the district court did not err by striking the report and testimony of Dr. Shanahan, which were offered by Perry solely to support his claim under § 1681m(d).

**B. Firm Offer of Credit Under 15 U.S.C. § 1681b(c)(1)(B)(i)**

Perry argued before the district court that she should be allowed to amend her complaint to allege that First National's credit solicitation was not a firm offer of credit and thus that First National was prohibited by 15 U.S.C. § 1681b(c)(1)(B)(i) from obtaining her credit information to make the solicitation. The district court denied the motion to amend, finding that the credit solicitation was a firm offer and that it would be futile for Perry to amend her complaint. According to the district court, Perry's allegations were distinguishable from those made by the plaintiff in *Cole v. U.S. Capital*, 389 F.3d 719 (7th Cir. 2004), in which we reversed a grant of summary judgment for defendants on a similar FCRA claim. The district court reasoned that although First National's credit solicitation offered a small minimum amount of credit, Perry failed to allege that the credit card's interest rate was unclear, that approval was not guaranteed, or that there were any usage limitations on the credit line.

Under 15 U.S.C. § 1681b(c), a credit or insurance provider can obtain a consumer's credit information from a credit agency without the consumer's permission only if the provider is making a "firm offer of credit" to the consumer. 15 U.S.C. § 1681b(c)(1)(B)(i). "Firm offer of credit" is defined by statute as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the

offer, except that the offer may be further conditioned on one or more of" several conditions that are not relevant to this appeal. 15 U.S.C. § 1681a(l).

In determining "whether the offer of credit comports with the statutory definition, a court must consider the *entire* offer and the effect of all the material conditions that comprise the credit product in question. If, after examining the entire context, the court determines that the 'offer' was a guise for solicitation rather than a legitimate credit product, the communication cannot be considered a firm offer of credit." *Cole*, 389 F.3d at 727-28; *see also Murray*, 434 F.3d at 955-56.

Perry relies on *Cole* to argue essentially that First National's credit solicitation was a sham, not a firm offer of credit, because it offered only a small amount of credit and required payment of comparatively large fees. Perry alleged:

> The solicitation offers a minimum credit line of $250. However, if the offer is accepted, the consumer is charged a processing fee of $9.00 (which is due with the application), an "acceptance" fee of $119.00, an annual membership fee of $50.00, and a "participation" fee of $72.00 per year (charged at a rate of $6.00 per month), for a total of $184.00 in fees for the opening of a credit card account, with $175.00 appearing on the first bill that the cardholder would receive. This means that the effective amount of credit being granted with the card is $75.00, with an outstanding balance of $175.00 that is subject to an annual percentage rate of 18.9%. The amount of credit being offered is therefore virtually worthless, and does not constitute a firm offer of credit.

We agree with the district court that First National's credit solicitation constituted a firm offer of credit. In *Cole*, we identified three factors supporting the appellant's argument that the defendant's solicitation was not a firm offer: 1) it was not clear that credit approval was guaran-

teed; 2) the precise rate of credit and other material terms were not included in the solicitation; and 3) the credit card limit, $300, was relatively small in relation to the known limitations of the card, which could be used only toward a vehicle purchase at a particular car dealership. *Cole*, 389 F.3d at 728. The *Cole* Court found that the appellant's pleadings reasonably supported the appellant's claim that the defendant's offer was a sham, made only to justify accessing consumer credit reports and solicit buyers for the car dealership. *Id.* The credit solicitation expressly stated that "[g]auranteed approval is neither express nor implied," which "create[d] a question whether the offer of credit w[ould] be honored." *Id.* Additionally, "the relatively small amount of credit combined with the known limitations of the offer—that it must be used to purchase a vehicle—raise[d] a question of whether the offer ha[d] value to the consumer." *Id.* The Court also found that the missing material terms from the credit solicitation "render[ed] it impossible for the court to determine from the pleadings whether the offer ha[d] value." *Id.*

The credit solicitation at issue in this case does not present the same problems as the solicitation in *Cole*. First, it is clear from the face of First National's solicitation that recipients are preapproved. The solicitation states, "Your good standing has been found creditworthy by Legacy Visa and that qualifies you for a new Visa account." Perry does not argue that she or any class member was denied credit upon responding to the solicitation. Second, the interest rate for the credit card is stated in the terms and conditions brochure sent with the credit solicitation, and is set at 18.9 percent.

Third, although the credit limit is quite low, the card can be used to purchase any products or services for which Visa is accepted. This is in stark contrast to the credit offered in *Cole*, which could be used only toward the purchase of a vehicle at a particular car dealership.

In *Cole*, the cost of purchasing a vehicle dwarfed the value of the credit offer. According to Perry, the credit line she was offered actually was much worse than the one at issue in that case, because *Cole* concerned a $300 credit line, whereas she was offered only "$75 in effective credit." Perry's argument is somewhat misleading. $75 would be the available credit limit in the first month the credit card was used. The processing fee ($9) and acceptance fee ($119) are one-time charges. Once these are paid, the credit recipient would be required to pay $6 per month for the participation fee and $50 the following year for the yearly membership fee.

We recognize that First National's credit solicitation requires card holders to pay a significant amount of money in fees, which are quite high in relation to the credit line offered. We realize that this is not an attractive deal for the great majority of consumers. However, the card is not without value. If the credit card holder paid off the card each month, the card would allow him or her to make almost $3000 in purchases in one year. The credit card holder would also build up a credit rating, which is useful to individuals who are trying to establish credit for the first time or to reestablish good credit. Additionally, First National's offer was not a "guise for solicitation," *Cole*, 389 F.3d at 728, or "a sham offer used to pitch a product rather than extend credit," *Murray*, 434 F.3d at 955. The only product First National offered was a credit line. Taking these factors together, we find that the district court did not err by denying Perry's request to amend her complaint to add her claim under 15 U.S.C. § 1681b(c)(1)(B)(i).[2]

---

[2]  In reaching this conclusion, we have considered our dissenting colleague's unease that First National's credit offer will be accepted only by those consumers who do not fully understand the offer's terms or by those who cannot obtain credit on more

(continued...)

Additionally, we affirm the district court's ruling to deny Perry's request to obtain discovery on the percentage of consumers who responded to First National's solicitation, the percentage that received credit cards, and the amount of money First National earns in interest as compared to the amount in earns in fees from credit cards like the one offered to Perry. Perry has not demonstrated that this evidence is relevant to our inquiry. As Perry admits, most consumers who receive credit solicitations do not apply for the offered credit card, regardless of how attractive the terms of the offer are. Also, Perry does not suggest that many consumers applied for First National's credit cards and were rejected. Finally, Perry does not explain why the district court should have let it obtain information on the amount of money First National earns in interest versus in fees. For instance, what ratio of interest charges versus fees would demonstrate that a credit offer was not a "firm offer"? The fact that First National may earn a significant portion of its revenues from fees charged for credit cards like those offered to Perry does not make its credit solicitation a

---

[2] (...continued)
favorable terms, such as individuals with very poor credit histories or who are emerging from bankruptcy. However, as the dissent acknowledges, the FCRA is designed to protect the privacy of consumers' credit histories, not to prevent consumers from making unwise financial choices even when they are provided with all the material terms necessary to make informed decisions. Additionally, we are concerned that accepting our colleague's position may have the unintended consequence of precluding consumers with past financial problems from obtaining credit at all, and thus make it even more difficult for them to receive loans and mortgages. We are understanding of the plight of consumers who must choose between having no credit and having credit on less than favorable terms, but we also recognize that a company like First National will not offer credit to consumers on terms that will not allow it to earn a return.

sham—the focus of our inquiry is whether the credit solicitation offers value to the consumer, and in this case we have determined that it does.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court in full.

EVANS, *Circuit Judge*, dissenting. I respectfully dissent, because I do not agree that the solicitation First National sent to Perry can reasonably be considered a "firm offer of credit."

True, the solicitation in this case does not present the exact same problems as the one at issue in *Cole v. U.S. Capital*, 389 F.3d 719 (7th Cir. 2004). In this case, recipients are "preapproved," the interest rate and other terms are disclosed, and the card can be used to do more than simply buy a car at a particular dealership. If those narrow factors were all that *Cole* required for a "firm offer of credit," I would gladly join the majority opinion.

But *Cole* emphasizes that under the FCRA, a firm offer of credit must have "sufficient value for the consumer," 389 F.3d at 726. The majority opinion, I believe, glosses over this larger point. As we explained, "A definition of `firm offer of credit' that does not incorporate the concept of value to the consumer upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through

the pre-screening process." *Id.* at 726-27. The three factors discussed by the majority are not the entire analysis. In *Cole* we recognized more broadly that the "terms of an offer . . . may be so onerous as to deprive the offer of any appreciable value." *Id.* at 728. To determine whether an offer meets the standards of the FCRA,

> a court must consider the *entire* offer and the effect of *all* the material conditions that comprise the credit product in question. If, after examining the entire context, the court determines that the "offer" was a guise for solicitation rather than a legitimate credit product, the communication cannot be considered a firm offer of credit.

*Id.*

I am troubled when I imagine the consumer for whom First National's product—with its $9 "processing fee," $119 "acceptance fee," $50 "annual membership fee," and $72 annual "participation fee," all coming out of a mere $250 line of credit—would be considered to carry appreciable value. Credit card companies employ savvy marketing analysts and sophisticated algorithms to target their offers toward particular niches of consumers. For anyone who understands credit card marketing schemes, it is difficult not to conclude that First National is using its privileged access to financial data simply to extract one creative fee on top of another from consumers who are either naive, desperate, or both.

The majority, echoing a point made by First National's counsel at oral argument, explains that the card is, in theory, "not without value" because a card holder who paid off her entire balance every month would have almost $3,000 in purchasing power (albeit in small revolving increments) each year. Of course, a consumer who has the cash flow to pay her bills in full every month has no actual need for credit. She would be better off with a bank

account debit card, for which she would not be required to enrich First National by $250 the first year and $122 each year thereafter.

Thus, the only person for whom First National's product objectively might have some utility is the consumer whose financial history is so catastrophic that a card encumbered by usurious fees, along with 18.9% interest, is the only option for rehabilitating a credit rating. Even so, before I could accept assurances about the card's theoretical value for such a consumer, I would need to know how many such card holders—who dutifully avoid late payments and maxed-out balances—actually are among First National's customers or within its target market for this particular product. I suspect not many, because they'd have better options.

Even if the FCRA is intended only to protect consumers' privacy, not to safeguard them against predatory credit practices and their own poor financial judgment, I conclude that First National's offer is not a "legitimate credit product," *id.*, which is distinguishable from a "sales pitch[ ]," *id.* at 727. In *Cole*, the sales pitch was for a car; in this case, it is for an unconscionably one-sided financial deal that defies a reasonable concept of sufficient value. On my reading of the relevant statute and our precedent, "[s]uch importuning simply—and understandably—is not among the permissible reasons for which a credit agency may disclose a consumer's credit information. Defining a firm offer of credit as merely any offer that will be honored elevates form over substance" and deprives the FCRA "of all serious purpose." *Id.* (citations omitted). For these reasons, I cannot join the majority opinion.

No. 05-3867

A true Copy:

 Teste:

     _____
     *Clerk of the United States Court of*
     *Appeals for the Seventh Circuit*