In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-8050

CE DESIGN LIMITED, on its own behalf
and that of a class,

*Plaintiff-Respondent-Appellee,*

*v.*

KING ARCHITECTURAL METALS, INC.,

*Defendant-Petitioner-Appellant.*

Petition for Permission to Appeal, and Appeal,
from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 2057—**Elaine E. Bucklo**, *Judge*.

SUBMITTED JANUARY 18, 2011—DECIDED MARCH 18, 2011

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. We have decided to grant the defendant's petition to be allowed to appeal from the district judge's certification of a class, in this suit under the Telephone Consumer Protection Act (as amended by the Junk Fax Prevention Act of 2005), 47 U.S.C. § 227. See Fed. R. Civ. P. 23(f). The petition presents a sufficiently

novel and important issue concerning class action practice to justify our allowing the appeal. And because the petition and the response are adequate substitutes for briefs and there is a voluminous record, compiled in the district court, to assist us in our consideration of the appeal, we shall not delay the litigation further by requesting additional briefing.

Review of a decision to certify a class is deferential, *Ervin v. OS Restaurant Services, Inc.*, No. 09-3029, 2011 WL 135708, at *4 (7th Cir. Jan. 18, 2011), but "deferential" doesn't mean "abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). A class "may only be certified if the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982) (emphasis added); see also, e.g., *In re Schering Plough Corp. ERISA Litigation*, 589 F.3d 585, 595-96 (3d Cir. 2009). Certification as a class action can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit. 1998 Advisory Committee Notes to Fed. R. Civ. P. 23(f) ("an order granting certification . . . may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability"); *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 834 (7th Cir. 1999) ("a grant of class status can put considerable pressure on the defendant to settle, even when the plaintiff's probability of success on the merits is slight"); *Hartford Accident & Indemnity Co. v. Beaver*, 466 F.3d 1289, 1294 (11th Cir. 2006); *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 145 (2d Cir. 2001). This is a useful reminder in the present

case because, as we'll see, the Telephone Consumer Protection Act makes violators strictly liable for cumulatively very heavy statutory penalties.

The need for rigorous analysis of a motion to certify a class is for the protection not of defendants alone but of the class members as well, especially given our court's recent movement toward allowing a prospective class only one real chance for the class to be certified; for we have directed district courts that have denied certification to enjoin efforts in other jurisdictions to certify essentially the same classes. *Thorogood v. Sears, Roebuck & Co.*, 624 F.3d 842, 850-52 (7th Cir. 2010). Denial of certification may be as heavy a blow to the class as grant of certification is to the defendant.

So far as relates to this case, the Telephone Consumer Protection Act forbids "unsolicited" fax advertisements. 47 U.S.C. § 227(b)(2)(C). Such advertisements ("junk faxes," as they are called) consume the recipient's paper and ink without his consent and are thus a source of irritation that has given rise to the statutory prohibition. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 639 (4th Cir. 2005); *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 323 F.3d 649, 654-55 (8th Cir. 2003); *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995). CE Design—a small civil engineering firm in the Chicago area that, unusually for a business firm, is an avid class-action plaintiff—has filed at least 150 class action suits under the Telephone Consumer Protection Act, according to its president, John J. Pezl. Every time CE receives what it considers an unsolicited fax

advertisement, Pezl sends it to the class action firm with which he works (and which represents CE in other matters as well).

It seems odd that a business firm would want to bring junk-fax suits, and especially odd that a civil engineering firm would want to sue a manufacturer of metal building components (King Architectural Metals, the defendant) for advertising its building components to the firm. Civil engineers advise their customers on such products and thus are indirect customers of companies like King. And it's not as if King inundated CE with faxed ads; there were only two, each of only one page. But CE's business model combines selling civil engineering services with filing class action junk-fax suits, and it's not unlawful to be a professional class action plaintiff. *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Indeed, an experienced plaintiff in such an action may be able to ensure that class counsel act as faithful agents of the class. *Id.* That is a common problem in class action litigation because often no member of the class has a significant financial stake—which may be the very reason that the suit is being brought as a class action.

What is a matter for concern is that Pezl, who has been deposed in (so far as he can recall) 20 of his company's suits, has engendered doubts about his truthfulness. *CE Design v. Beaty Construction, Inc.*, No. 07 C 3340, 2009 WL 192481, at *6, *7 n. 3 (N.D. Ill. Jan. 26, 2009). He did so in the present suit. Although the district judge remarked that what she euphemistically called a "dis-

crepancy" in Pezl's deposition was "immaterial" to the issue of certification, it was immaterial just to the view she took of it; Pezl couldn't have known what that view would be when he testified to having been unaware that by giving CE's fax number to the *Blue Book* (of which more shortly) he had expressly authorized the other subscribers, who include King, to "communicate" with CE by fax. The accuracy of that testimony is, as we shall see, an important issue in deciding whether he is a proper representative of the class; the district judge missed its importance.

During a period of about a month in 2009, King faxed some 500,000 ads; it was its first fax marketing campaign (and, we're guessing, its last). The certified class includes those recipients who had not given express permission to receive faxed advertisements, unless they had been King's customers or had an established business relationship with it. CE contends that the vast majority of the faxes do not fall within any exception created by the Act. If that is true, then because statutory damages are $500 per violation, 47 U.S.C. § 227(b)(3)(B)—and can be trebled if the court finds that the violation was willful or knowing, § 227(b)(3)(C)—King is facing a very large potential liability. (Some statutes, such as the Fair Debt Collection Practices Act and the Truth in Lending Act, cap damages, 15 U.S.C. §§ 1640(a)(2)(B), 1692k(a)(2)(B)(ii). The Telephone Consumer Protection Act does not.) That is relevant, as explained earlier, to the need for a rigorous analysis of whether to certify a class.

King makes a number of arguments against certification, but only those relating to the linked issues of the

typicality of CE's claim (see Fed. R. Civ. P. 23(a)(3); *Harper v. Sheriff of Cook County*, 581 F.3d 511, 513 (7th Cir. 2009); *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009)), and the adequacy of CE's representation of the class, have sufficient merit to warrant discussion.

A class is disserved if its representative's claim is not typical of the claims of the class members, for then if his claim fails, though claims of other class members may be valid, the suit will at the least be delayed by the scramble to find a new class representative. Alternatively, a class representative's atypical claim may prevail on grounds unavailable to the other class members, leaving them in the lurch.

In many cases, including this one, the requirement of typicality merges with the further requirement that the class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); see *J.H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). In light of the statement in *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996), that "typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members," we'll focus our analysis on adequacy. CE cannot be an adequate representative of the class of unconsenting recipients of King Architectural Metals' faxes if it is subject to a defense that couldn't be sustained against other class members, as in *Koos v. First National Bank of Peoria*, 496 F.2d 1162, 1164-65 (7th Cir. 1974), or if Pezl is not credible on the key

question of whether CE invited or permitted the faxed advertisements about which it now complains. (If it did, its claim fails.) But it is important to distinguish between adequacy of representation and the merits of the suit. The merits are not before the appellate court when the court is reviewing the district court's certification of the class. *Schleicher v. Wendt*, 618 F.3d 679, 686-88 (7th Cir. 2010); *Murray v. GMAC Mortgage Corp.*, *supra*, 434 F.3d at 954. The only question we can consider is whether, however meritorious the suit itself may be, the claim of the class representative may be subject to a defense (that of consent to be faxed ads) that makes it an inappropriate representative of the class because other class members may not be subject to the same defense, or perhaps to any defense.

The Act defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). King argues that CE gave it "express invitation or permission" to fax advertisements to it. CE posted its fax number on its website, and next to it the phrase "Contact Us." More important, it signed a form that both authorized the publication of its fax number in the *Blue Book of Building and Construction*—a print and (mainly) online directory similar to the Yellow Pages but aimed at firms in the building industry—and authorized the other subscribers to the *Blue Book*, such as King, to "communicate" with it, including via fax. For the *Blue Book* states that "by supplying The Blue Book with your

fax and e-mail address, you agree to have The Blue Book *and users of The Blue Book services* communicate with you *via fax* or e-mail" (emphasis added).

Whether the website plus the *Blue Book* form added up to CE's consenting for King to fax advertisements to it presents a question that neither the statute nor the case law, nor the interpretation of the statute by the Federal Communications Commission, answers. The only appellate decision dealing with the question appears to be *Travel 100 Group, Inc. v. Mediterranean Shipping Co. (USA) Inc.*, 889 N.E.2d 781, 788-90 (Ill. App. 2008). It interprets "express invitation or permission" broadly enough to support King's position, but the facts were quite different from those of this case.

Civil engineering firms are direct or indirect customers of sellers of building components, and why else would those sellers want to "communicate" with civil engineers by fax except to advertise their wares to them? In this age of email and other Internet communication systems, faxes are used by businesses for little else besides advertising. King claims without contradiction that many of its faxed advertisements were faxed to companies or individuals that had asked it for catalogs and other sales materials. Catalogs and other mailed sales materials are just other advertising media. They don't use the recipient's paper and ink, but a recipient who is in the building business probably doesn't care about the form in which potential suppliers communicate with it or the expense of receiving a fax. Fax paper and ink used to be expensive but are no longer.

"The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J.H. Cohn & Co. v. American Appraisal Associates, Inc.*, *supra*, 628 F.2d at 999 (citation omitted). A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative. See, e.g., *Koos v. First National Bank of Peoria*, *supra*, 496 F.2d at 1164-65; *Schleicher v. Wendt*, 2009 WL 761157, at *3 (S.D. Ind. March 20, 2009), affirmed on other grounds, 618 F.3d 679 (7th Cir. 2010).

By giving its fax number to the *Blue Book* for publication, CE publicized the number to the *Blue Book*'s other subscribers. The *Blue Book* brings together companies in construction, civil engineering, and architecture to facilitate their marketing to one another. Pezl's testimony that he was unaware that he had authorized publication of CE's fax number in the *Blue Book* is both difficult to credit, as the district judge acknowledged, and, if disbelieved, could be thought evidence of Pezl's fearing that the publication of CE's fax number could indeed be construed as permission to fax ads to that number. The legend "Contact Us" next to CE's fax number on the company's website could be thought to reinforce an inference of permission from the publication of the fax

number in the *Blue Book*. Compare *Murray v. GMAC Mortgage Corp., supra*, 434 F.3d at 954. And notice that the invitation or permission required by the statute for authorizing faxed ads may be "in writing or otherwise"—no specific form of invitation or permission is specified. The district judge did not give adequate consideration to the cumulative significance of Pezl's testimony, the publication of CE's fax number in the *Blue Book*, and its publication on CE's website, in ruling that CE was an adequate representative of the class.

A 2003 regulation of the Federal Communications Commission on which the judge relied states that the mere fact of publication of one's fax number in a directory or a website is not express permission to fax advertisements to that number. But it adds that "given the variety of circumstances in which such numbers may be distributed (business cards, advertisements, directory listings, trade journals, or by membership in an association), it [is] appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements *on a case-by-case basis*" and that "express permission to receive a faxed ad requires that the consumer *understand* that by providing a fax number, he or she is agreeing to receive faxed advertisements." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14129 (FCC 2003), 2003 WL 21517853 (emphases added). A more recent regulation states that "the fact that [a] facsimile number was made available in a directory, advertisement or website does not *alone* entitle a person to send a facsimile advertisement to that number." *In re Rules*

*and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 F.C.C.R. 3787, 3796 (FCC 2006), 2006 WL 901720 (emphasis added). The words we've italicized in these two passages create uncertainty about the application of "express invitation or permission" to CE's conduct.

The uncertainty is reinforced by the deposition of the *Blue Book*'s editor, taken by one of CE's lawyers in an earlier suit under the Telephone Consumer Protection Act but made a part of the record in the present case. The editor described the *Blue Book* succinctly as a "buying guide for the construction industry," and the following exchange with the lawyer ensued:

> Q. Okay. And what I understand is that in terms of people or entities that put their name and address into the Blue Book, is that basically for companies to advertise to get work and submit bids for potential business from this potential client base that might not necessarily be in the Blue Book itself but in the database? [objection and clarification omitted]

> A. Yes. People advertise and list themselves in the Blue Book because they are looking to get exposure. The mission of the Blue Book is to bring buyers and sellers together. So we have this unlisted circulation base or user base that they want to get in front of, and they also want to get in front of the companies that are listed in the Blue Book.

> . . .

> Q. Is the underlying purpose of the Blue Book for companies to get exposure to advertise to get work

and submit bids for potential business for their particular company?

A.  That's correct.

. . .

A.  The Blue Book is distributed so people in the construction industry can contact each other. So they have a directory. It's like a yellow page of construction. They can find whatever service, product, equipment that they're looking for, and they're able to easily contact that company.

Q.  Exactly. And they're looking to contact that company to see if that company will do business for them? [objection omitted]

A.  Well, they contact them for a variety of reasons. They do contact them to see if they can work for them or if they can purchase their things. Or many times they contact them to promote their company to them to let them know that, hey, I'm in business in this region, you know, kind of like the GC Showcase. Can you put me on your vendor list? They use it to introduce themselves to other people in the industry.

The editor's testimony suggests that subscribers to the *Blue Book* expect and consent to receive ads, including by fax since they are required to publish their fax number in the *Blue Book* if they subscribe and since no business, as distinct from a consumer, is likely to care whether an ad that it wants to receive comes by email, snail mail, or fax.

The record raises serious doubts concerning the truthfulness of Pezl's testimony about his familiarity with the terms of the contract with the *Blue Book*. The district court erred in treating the subject as immaterial; express consent to communications by fax and email from *Blue Book* subscribers raises a substantial question. The contractual "consent" to communications among a community of businesses involved in the construction industry seems to have no point other than to provide the consent required by this federal law and perhaps similar state laws. The credibility problem and the consent defense are vital in assessing CE Design's adequacy as a class representative. We conclude that, as in *In re Schering Plough Corp. ERISA Litigation, supra*, 589 F.3d at 600, and *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006), the district court must reconsider its ruling that the named plaintiff is a proper class representative.

We don't want to be misunderstood, however, as extending an invitation to defendants to try to derail legitimate class actions by conjuring up trivial credibility problems or insubstantial defenses unique to the class representative. Serious challenges to typicality and adequacy must be distinguished from petty issues manufactured by defendants to distract the judge from his or her proper focus under Rules 23(a)(3) and (4) on the interests of the class, as emphasized in *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990), where the judge, while decertifying the class, remarked that "few plaintiffs come to court with halos above their heads; fewer still escape with those halos untarnished. For an assault on the

class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." See also *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992); and compare the denial of class certification in *Koos v. First National Bank of Peoria, supra,* 496 F.2d at 1164-65; *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998), and *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), with its grant in *Randolph v. Crown Asset Mgmt., LLC*, 254 F.R.D. 513, 518 (N.D. Ill. 2008); *In re Farmers Ins. Co. FCRA Litigation*, 2006 WL 1042450, at *6 (W.D. Okla. Apr. 13, 2006); *Nelson v. IPALCO Enterprises, Inc.*, 2003 WL 23101792, at *6 (S.D. Ind. Sept. 30, 2003), and *Rodger v. Electronic Data Systems Corp.*, 160 F.R.D. 532, 539 (E.D.N.C. 1995).

Should the court decide that CE is not a proper class representative, that would not conclude the question whether the suit should be allowed to proceed as a class action. CE's law firm might be able to find a class member who would substitute for CE—a member less vulnerable to the defense of invitation or permission. King markets its product to consumers as well as to businesses. See www.kingmetals.com (visited Feb. 28, 2011). We do not know whether any consumers received the faxed advertisements but if some did, and any of those who did clearly hadn't authorized King to fax advertisements to them (consumers do not subscribe to the *Blue Book*), one or more of them would be potential

class representatives not subject to the defense that King could raise against CE's claim.

Another possibility, should CE be forced to abdicate as class representative, might be certification of separate classes: a class of recipients of King's faxed ads who are potentially subject to a defense of invitation or permission and a class of recipients who are not. The merits of the consent defense based on the terms of the *Blue Book* contract—win or lose—might well be suitable for determination on a classwide basis.

We vacate the class certification and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED.