Filed 4/21/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ADAM N. MARTINEZ, | F089576 |
| Plaintiff and Appellant, | (Super. Ct. No. VCU299663) |
| v. | |
| SIERRA LIFESTAR, INC., | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary M. Johnson, Judge.

Moon Law Group, H. Scott Leviant, Kane Moon, Lilit Ter-Astvatsatryan, and Chancellor D. Nobles for Plaintiff and Appellant.

Howard A. Sagaser and Brent C. Woodward for Defendant and Respondent.

-ooOoo-

Plaintiff Adam Martinez appeals the denial of his motion for class certification of wage and hour claims against his former employer.  Martinez alleges Sierra Lifestar, Inc. (Lifestar) miscalculated the "regular rate of pay" (Lab. Code, § 510, subd. (a)) of approximately 135 workers by excluding nondiscretionary bonuses, which caused Lifestar to underpay overtime, double time, and premiums for meal and rest periods.

Lifestar opposed class certification, arguing common questions of law or fact did not predominate and, furthermore, Martinez's claim was not typical of the proposed

classes. Lifestar supported this argument by asserting it paid 10 types of bonuses, each type of bonus had its own criteria, Martinez was paid only one type of bonus, and he received that "EMS Bonus" only once. "EMS Bonus" is Lifestar's pay code for a bonus given to its employees in connection with National Emergency Medical Services Week.

The trial court denied the motion for class certification on the sole ground that Martinez did not establish his claim was typical of the other claims arising from his theory that Lifestar improperly excluded bonuses when calculating an employee's regular rate of pay. We conclude the trial court committed legal error in its analysis of whether a unique defense defeated the typicality of Martinez's claim. Lifestar's arguments that Martinez's EMS Bonus was properly excluded from his regular rate of pay because it was in the nature of a gift, was discretionary, or both, are not unique to Martinez. Those arguments apply to all EMS Bonuses paid to Lifestar's other employees for National Emergency Medical Services Week and, therefore, are not unique to Martinez.

We therefore reverse the order denying class certification and remand for further consideration of the class certification motion.

## FACTS

Lifestar, doing business as Lifestar Ambulance, provides 911 emergency ambulance services to the City of Tulare and the Tipton, Pixley and Earlimart areas of Tulare County. Lifestar's ambulances operate out of three stations, which are located on North M Street in Tulare, South I Street in Tulare, and East Ellsworth Avenue in Pixley. Two ambulances are assigned to the North M Street station, one (sometimes two) to the South I Street station, and one to the Pixley station.

Lifestar employs paramedics, emergency medical technicians (EMT), clerical staff, and an IT technician. Employees are paid on an hourly basis every two weeks. Jacqueline Paull, Lifestar's vice-president, testified during her January 2025 deposition that Lifestar's current staff included approximately 13 or 14 paramedics, 40 to 45 EMT's,

2.

three clerical staff who handled billing, and one IT technician. Paull was designated as Lifestar's person most knowledgeable.

Martinez asserts the putative class consists of approximately 135 current and former employees. This assertion is based on Martinez's expert's review of the time and pay data produced by Lifestar in discovery. That data covered 135 employees who worked during the pay periods ending July 20, 2019, through November 30, 2024. That time span reflects Martinez's definition of the "CLASS PERIOD" as running from July 5, 2019 (three years before this lawsuit was filed) to the present. We conclude that, for purposes of the class certification motion, Martinez has demonstrated the putative class has approximately 135 members.

Martinez worked as a Lifestar EMT for about 10 months from September 2019 to July 2020. Lifestar's vice-president testified Martinez's hourly wage was likely minimum wage. In May 2020, Martinez received an "EMS Bonus." "EMS" stands for emergency medical services. Lifestar's vice-president stated Martinez received the bonus for National Emergency Medical Services Week, which is the third week of May each year. She described the week as "an opportunity to recognize paramedics and EMTs for the difficult job that they do" and stated Lifestar always recognizes the week with different activities for its employees, which usually include food every day. She stated Lifestar gave all its employees a bonus for EMS week and "it might be a gift. It might be a radio. It might be trauma shares. It never -- it's not usually the same. It may be gift cards, but, you know, always something." When asked if every employee of Lifestar received an EMS Bonus for National Emergency Medical Services Week in 2020, the vice-president answered "Yes." She also stated the EMS Bonus was paid separately with Lifestar taking into consideration the amount of withholding and then paying a bonus that would net its EMTs $100.

The time and pay data Lifestar produced during discovery contained 24 pay stubs issued to Martinez, including the separate pay stub for the May 2020 EMS Bonus. Lifestar's time and pay data also showed it had pay codes for nine other types of bonuses paid to its employees. The other bonuses are listed later in this opinion.

## PROCEEDINGS

On July 5, 2023, Martinez filed a class action complaint on behalf of himself and similarly situated current and former employees of Lifestar. Four months later, Martinez filed a first amended class action complaint (FAC), which is the operative pleading in this appeal. The FAC contains claims for failure to pay minimum wages and overtime compensation, failure to provide meal periods and rest breaks, failure to indemnify necessary business expenses, failure to timely pay final wages at termination, failure to provide accurate itemized wage statements, unfair business practices, and civil penalties under the Private Attorney General Act (PAGA; Lab. Code, § 2698, et seq.).

The FAC alleges that Martinez, the class members, and aggrieved employees received nondiscretionary bonuses that Lifestar failed to include when calculating the correct overtime rate of pay, meal break premium rate of pay, and sick day rate of pay, which caused Martinez and the class members to be underpaid. Addressing the factor for class certification at the core of this appeal, the FAC stated in conclusory fashion: "Typicality: [Martinez] is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom there is a shared, well-defined community of interest, and [his] claims (or defenses, if any) are typical of all Class Members' claims as demonstrated herein."

In February 2025, Martinez filed a motion for class certification that proposed (1) a "regular rate" class consisting of all current and former hourly employees who were paid one or more of the 10 bonuses identified in Lifestar's time and pay data and whose bonuses were not included the regular rate of pay Lifestar used to calculate the

4.

employee's overtime and premium pay for noncomplying meal and rest breaks.  !(CT 241:17-242:5)!  Martinez proposed a "Waiting Time Penalties Subclass" of the regular rate class consisting for employees whose employment with Lifestar ended "at any time between July 5, 2020, to the present."  The claims of this subclass addressed the failure to timely pay accurate *final* wages in compliance with Labor Code sections 201 through 203.  Martinez also proposed a "wage statement" class of current and former employees who worked for Lifestar from July 5, 2022, to the present and received one or more of the 10 bonuses.  This class of claims addressed the failure to provide accurate itemized wage statements in compliance with Labor Code section 226.7.  The inaccuracies alleged are based on the failure to include bonuses in calculating the regular rate of pay.

Martinez supported his class certification motion with declarations from himself, his attorney, and Teresa Fulimeni, M.A., an expert who has testified in many economic loss and wage and hour cases.  His attorney's declaration attached pages from the transcript of the deposition of Lifestar's vice-president.  Fulimeni's declaration set forth facts derived from her analysis of the time and pay data Lifestar produced in discovery.  Those facts and her analysis are described in part III.A. of this opinion.

Lifestar's opposition to the motion for class certification was supported by a declaration of Brent Woodward, one of its attorneys.  Exhibits to Woodward's declaration included a portion of Lifestar's time and pay records produced in discovery and a table summarizing his analysis of those records.  The table and its conclusions are described in part III.A.3. of this opinion.

Lifestar asserted the class claims proposed by Martinez (1) focused on the 10 types of bonuses paid by Lifestar; (2) each of the 10 types of bonuses was unique; and (3) Martinez was paid only one type of bonus (i.e., the EMS Bonus) and only on one occasion.  Addressing Martinez's theory of liability, Lifestar argued he had failed to establish any bonus was improperly excluded from the regular rate of pay calculations

5.

Lifestar used in paying overtime. Addressing the criteria for class certification, Lifestar argued Martinez failed to meet his burden of establishing (1) common questions of law and fact predominated and (2) his claim was typical of the claims of the proposed class.

After Martinez filed a reply, the trial court issued a tentative ruling to deny the motion. The court heard counsel's arguments on March 24, 2025, and took the motion under submission.

The next day, the court filed a six-page ruling denying the class certification motion. The ruling stated each type of bonus presented "the possibility of somewhat unique defenses" because "there are a number of categories of exclusions that may apply to a given type of bonus payment." The ruling cited section 49.1.2.4 of the Division of Labor Standards Enforcement Policies and Interpretations Manual (DLSE Manual), stating it listed "roughly nine categories of payments that are to be excluded in determining 'regular rate.' " The ruling specifically mentioned the exclusions for " 'payments in the nature of gifts' " and sums paid in recognition of services performed where both the fact of payment and the amount " 'are determined at the sole discretion of the employer.' " (DLSE Manual, § 49.1.2.4, subds. (1), (3).) The ruling stated a significant possibility existed that Martinez "would be uniquely subject to a defense based on" either or both exclusions and, further, the unique defenses applicable to Martinez would threaten to become the focus of the litigation.

The trial court concluded Martinez had failed "to establish that he has claims typical of the proposed class based on the submitted bonus/regular-rate-of-pay class theory." The ruling explicitly stated the court did not reach the issues of whether different factual questions arise with respect to each of the 10 types of bonuses and, as a result, whether the proposed class action might "not be 'one of common or general interest.' (Code Civ. Proc., § 382[.])"

Martinez filed a timely appeal.

**DISCUSSION**

I.      LEGAL THEORY UNDERLYING THE CLAIMS

Here, we describe the legal foundation for Martinez's theory that Lifestar miscalculated the regular rate of pay for Martinez and other current and former employees by excluding bonuses from that calculation and, thus, underpaid the overtime and premium pay due. That foundation consists of Labor Code sections 510 and 226.7 and provisions of the DLSE Manual.

A.      The Regular Rate of Pay

The term "regular rate of pay" is used in Labor Code section 510, subdivision (a), which provides for overtime and double time compensation when an employee works in excess of eight hours in one workday or in excess of 40 hours in one workweek. Excess hours are compensated using a multiple of "the regular rate of pay for an employee." (Lab. Code, § 510, subd. (a).)

The term "regular rate of pay" is synonymous with the term "regular rate of compensation" used in Labor Code section 226.7, subdivision (c). (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 863 (*Ferra*).) Labor Code section 226.7 mandates meal, rest, or recovery periods during which employees shall not be required to work. For each workday that such a period is required but not provided, the employee shall be paid "one additional hour of pay at the employee's regular rate of compensation." (Lab. Code, § 226.7, subd. (c).) The compensation for a noncompliant meal, rest, or recovery period is commonly referred to as premium pay. (*Ferra*, *supra*, at p. 869.)

B.      Bonuses and Calculating the Regular Rate of Pay

California follows the definition of regular rate of pay set out in the Fair Labor Standards Act of 1938 (FLSA; 29 U.S.C. § 201 et seq.; see DLSE Manual, § 49.1.2.) The term "regular rate of pay" encompasses all nondiscretionary payments, not just the

7.

employee's base hourly wage.  (*Ferra*, *supra*, 11 Cal.5th at p. 863.)  As a result, an employee's regular rate of pay may differ from his or her straight time rate (i.e., normal hourly wage rate).  (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 554.)  For instance, an employee's straight time rate is adjusted to include the per-hour value of any nonhourly compensation the employee has earned, such as incentive pay.  An example of incentive pay included in the regular rate of pay is a flat sum attendance bonus of $15 per day for working a full shift on a Saturday or Sunday.  (*Alvarado*, *supra*, 4 Cal.5th at pp. 549, 554.)  DLSE Manual section 49.1.1. states:  "The regular rate of pay includes many different kinds of remuneration, for example: hourly earnings, salary, piece work earnings, commissions, *certain bonuses*, and the value of meals and lodging."  (DLSE Manual, § 49.1.1., italics added.)  In addition, the various adjustments made to an employee's straight time rate mean an employee's "[r]egular rate of pay … can change from pay period to pay period."  (*Alvarado*, *supra*, at p. 554.)

The computation of an employee's regular rate of pay and overtime is addressed in chapter 49 of the DLSE Manual.  It contains a list of payments that are to be excluded in determining an employee's regular rate of pay.  (DLSE Manual, § 49.1.2.4.)  Section 49.2 of the DLSE Manual sets forth the *methods* used to compute the regular rate of pay and section 49.2.4 explains how to compute the regular rate of pay and overtime on a bonus.  Provisions of chapter 49 relevant to the EMS Bonus are quoted in part III.B. of this opinion.

C.    Claims of Martinez and the Class Members

In his FAC, Martinez alleged various theories of liability.  After discovery, Martinez submitted a motion for class certification along with a proposed trial plan that narrowed the theories of liability being pursued.  Martinez proposed a "regular rate class" consisting of current and former employees who were paid overtime and premium pay and also were paid nondiscretionary bonuses described as (1) Bonus, (2) Clerical Bonus,

8.

(3) Clerical Training Bonus, (4) EMS Bonus, (5) Lead Bonus, (6) Manager Bonus, (7) Paramedic Bonus, (8) Preceptor EMT Bonus, (9) Preceptor Paramedic Bonus, and (10) Sign-On Bonus. Martinez's theory of liability asserted the failure to include the bonuses in computing the regular rate of pay violated Labor Code provisions governing the payment of overtime, meal premiums, and rest premiums and the provision requiring accurate itemized wage statements.

Accordingly, in general terms, the legal theory for Martinez's claim is the same as the legal theory for the class members' claims—that is, the regular rate of pay used to calculate overtime, double time, and premium pay owed to each employee was understated because the rate of pay did not include one or more nondiscretionary bonuses paid to the employee. This shared legal theory means there are common questions of law raised by each class members' claims. At a general level, the legal principles governing the payment of overtime, double time, and premium pay will be applied to the claims. (Lab. Code, §§ 510, 226.7.) In addition, some of the broader principles governing the inclusion of bonuses in the regular rate of pay would apply to all the claims, while the specific rules might vary depending on the particular type of bonus at issue. (See DLSE Manual, §§ 49.1.2.4, 49.2.4, 49.2.5; see also 29 C.F.R. §§ 778.115, 778.211, 778.212.)

## II.    PRINCIPLES GOVERNING CLASS ACTIONS

### A.    Criteria for Class Certification

Code of Civil Procedure section 382[1] authorizes a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." This language is the basis for specific requirements the Supreme Court has identified for class certification. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

---

[1]    Undesignated statutory references are to the Code of Civil Procedure.

9.

The moving party "must demonstrate the existence of [1] an ascertainable and [2] sufficiently numerous class, [3] a well-defined community of interest, and [4] substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] " 'In turn, "community of interest is comprised of three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Ibid.*) When these three factors are substituted into the list of what a moving party must demonstrate, there are a total of six criteria for class certification: (1) ascertainability, (2) numerosity, (3) predominance of common questions, (4) typicality, (5) adequacy of representation, and (6) superiority.

These criteria are the same as, or similar to, the express and implied requirements in rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.) (Rule 23). California courts have long recognized that Rule 23 and federal case law may provide useful guidance where California precedent is lacking. (*Green v. Obledo* (1981) 29 Cal.3d 126, 145–146; *Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 301, fn. 7.)

## B. Appellate Review

An order denying a class certification motion is appealable. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.) Trial courts are afforded great discretion in granting or denying certification and, in accordance with that discretion, a certification order will not be disturbed unless it is unsupported by substantial evidence, was based on improper criteria, or was based on erroneous legal assumptions. (*Brinker, supra,* 53 Cal.4th at p. 1022.) In other words, the discretionary authority exercised by trial courts does not allow them (1) to make "findings of fact without sufficient evidentiary support," (2) "to apply an incorrect rule of law," or (3) to misapply the correct rule of law to the facts of the case, which includes making a decision that falls outside the permissible range of options

10.

established by the applicable legal criteria. (*County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316 [specific ways discretion can be abused].)

Appellate courts "review the trial court's actual reasons for granting or denying certification." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530.) If the stated reasons are erroneous, a reversal is required even where other reasons not relied upon might have justified the ruling. (*Ibid.*; see *Brinker*, *supra*, 53 Cal.4th at p. 1052 ["remand to the trial court for it to reconsider meal period subclass certification in light of the clarification of the law we have provided"].) In this appeal, the principle that appellate review is limited to the stated reasons is significant because the trial court's only ground for denying class certification was Martinez's failure to meet "his burden to establish his claims are typical of the proposed classes." Accordingly, our review is limited to the issue of typicality.

### C. Typicality Requirement

#### 1. Applicable Test

The description of the typicality requirement in California case law is based on federal decisions. The California cases state the requirement's purpose is to ensure the interest of the named representative aligns with the interests of the class. (*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375, citing *Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.) " ' " 'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.' " [Citations.] The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." ' " (*Seastrom v. Neways, Inc.*, *supra*, at p. 1502; see *Hanon v. Dataproducts Corp.* (9th Cir. 1992) 976 F.2d 497, 508.) An example of someone who utterly fails the typicality requirement is a class representative who does not have a claim

against the defendants.  (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 98.)

Many federal decisions provide context for the test's application by stating "the test for typicality is not demanding."  (*Mullen v. Treasure Chest Casino, LLC* (5th Cir. 1999) 186 F.3d 620, 625; *Bittinger v. Tecumseh Products Co.* (6th Cir. 1997) 123 F.3d 877, 884 ["test for typicality, like commonality, is not demanding and does not require identicality"]; *Lightbourn v. County of El Paso, Tex.* (5th Cir. 1997) 118 F.3d 421, 426 ["test for typicality, like the test for commonality, is not demanding"]; *Karvaly v. eBay, Inc.* (E.D.N.Y. 2007) 245 F.R.D. 71, 82 ["Like commonality, the typicality prong of Rule 23(a) sets a relatively low threshold."]; *Gilkey v. Central Clearing Co.* (E.D.Mich. 2001) 202 F.R.D. 515, 524; see 1 Newberg and Rubenstein on Class Actions (6th ed. 2025) § 3:29 ["The test for typicality is not demanding"].)  Similarly, the First District noted "that it has never been the law in California that the class representative must have *identical* interests with the class members."  (*Classen v. Weller* (1983) 145 Cal.App.3d 27, 46.)

### 2. Typicality's Relationship to Other Criteria

To provide context for how the typicality requirement applies in this case, we describe its relationship with the other class certification criteria.  Numerosity and commonality "identify the characteristics of a class that make representative litigation appropriate, namely that many individuals share common legal or factual questions."  (1 Newberg and Rubenstein on Class Actions, *supra*, § 3:28 [Rule 23(a)(3)'s typicality requirement].)  In contrast, typicality and adequacy of representation "focus on the desired attributes of the class's representative."  (*Ibid*.)

Despite being procedurally and substantively distinct, the typicality requirement overlaps with the commonality and adequacy of representation requirements.  (1 Newberg and Rubenstein on Class Actions, *supra*, § 3:30 [typicality's overlap with other

12.

prerequisites]; see *Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. 338, 350 [commonality and typicality requirements tend to merge, and those requirements tend to merge with the adequacy of representation requirement]; see also, *Brinker, supra*, 53 Cal.4th at p. 1021 [three factors comprising "a community … of interest" under Code Civ. Proc., § 382].) Commonality and typicality both measure the degree of interrelatedness among the claims in the class action. (1 Newberg and Rubenstein on Class Actions, *supra*, § 3:31.) Commonality addresses the interrelatedness of all class member claims with one another, requiring the members' claims share at least one common question of law or fact. In contrast, typicality addresses the interrelatedness of the class representative's claims to those of the proposed class. For the class representative's claims to be sufficiently similar to those of the class members, his or her claims must share some common questions of law or fact with the class members' claims. Thus, "a finding of typicality logically presupposes a finding of commonality." (*Ibid*.) However, because the typicality inquiry is narrowly focused on one or a few class representatives, it provides a standard that is slightly more exacting than the commonality requirement. Thus, despite the overlap between commonality and typicality, it is possible for commonality to exist within the class while the class representative's claims are not typical of the class. (*Ibid*.)

Next, we briefly describe the relationship between typicality and adequacy of representation. Both requirements seek to ensure the class representative will pursue the claims of class members with sufficient effort and ability. (1 Newberg and Rubenstein on Class Actions, *supra*, § 3:32.) When typicality is satisfied, the interests of the class representative are closely aligned with those of the class and the representative's pursuit of her own interests also will promote those of the class. Thus, typicality overlaps with adequacy because, " 'in the absence of typical claims, the class representative has no incentive to pursue the claims of other class members.' " (*Ibid*.)

13.

Because the analysis of commonality, typicality, and adequacy of representation converges, "courts sometimes assess the typicality prerequisite in tandem with one or both of these other requirements." (7 Newberg and Rubenstein on Class Actions, *supra*, § 23:21; e.g., *McLaurin v. Prestage Foods, Inc.* (E.D.N.C. 2010) 271 F.R.D. 465, 475 [in employment wage and hour case, commonality and typicality analyzed together].) The reason we have provided the foregoing overview of how the typicality requirement relates to the commonality and adequacy of representation requirements is that evidence presented to establish commonality and adequacy may also be relevant to establishing the plaintiff's claims are typical of those of the class members. Therefore, our review of the evidence is not limited to the items cited in the parts of Martinez's moving papers addressing typicality. (See pt. III.A.1., *post*.)

### 3. *Typicality in Employment Law Cases*

"Employment class actions constitute a central part of class action practice in the United States." (7 Newberg and Rubenstein on Class Actions, *supra*, § 23:1.) Class actions pursuing wage and hour claims frequently reach California's appellate courts. (E.g., *Huerta v. CSI Electrical Contractors* (2024) 15 Cal.5th 908, 915, 917 [class action seeking payment for unpaid hours worked; employee's time spent on employer's premises awaiting and undergoing mandatory inspection procedure was compensable as hours worked]; *Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93, 103 [trial court certified a class for claims alleging violation of state meal break requirements and the related timely payment and wage statement claims]; *Brinker*, *supra*, 53 Cal.4th at p. 1017 [review granted "to consider issues of significance to class actions generally and to meal and rest break class actions in particular"].) Indeed, the Second District has stated "that classwide relief remains the preferred method of resolving wage and hour claims[.]" (*Martinez v. Joe's Crab Shack Holdings*, *supra*, 231 Cal.App.4th at p. 384.)

When considering typicality in employment cases, courts "have generally deemed immaterial to the typicality analysis differences in class members' salaries, differences in class members' responsibilities, and differences in an employee's qualifications. Standing alone, these factors do not defeat the conclusion that the proposed class representative's claims are typical of the class's claims." (7 Newberg and Rubenstein on Class Actions, *supra*, § 23:23 [typicality in employment cases], fns. omitted.; see *Hoffman v. Blattner Energy, Inc.* (C.D.Cal 2016) 315 F.R.D. 324, 337 [in wage and hour cases, the fact class members' damages claims varied "due to differences in their wages, job titles, or period of employment does not defeat class certification"].) In contrast, court generally find typicality lacking where the plaintiff's claims implicate highly individualized fact differences that necessitate an analysis unlike the class's claims or where the plaintiff's questionable work record may trigger defenses individual to him or her. (7 Newberg and Rubenstein on Class Actions, *supra*, § 23:23; see *Mateo v. V.F. Corp.* (N.D.Cal., Oct. 27, 2009, No. C 08-05313 CW) 2009 WL 3561539, p. *4 [in a wage and hour case, plaintiff's claims were not typical because plaintiff was responsible for making and enforcing the daily schedule, which included rest periods and meal breaks for herself and other class members; company raised a defense unique to plaintiff by arguing she violated company policy by allowing herself and other employees to miss breaks and to work after clocking out].)

III.   MARTINEZ'S CLAIM IS TYPICAL OF THE CLASS CLAIMS

    A.   <u>Inclusion of Bonuses in the Regular Rate of Pay</u>

        *1.   Evidence in the Record*

The evidence relevant to defining the claims of Martinez and the class members includes Martinez's declaration, the declarations of counsel, the declaration of expert Fulimeni, and the deposition testimony of Lifestar's vice-president.

In response to Martinez's first request for production of documents, Lifestar produced the time and pay data for all putative class members, including Martinez. Fulimeni reviewed the time and pay data (including pay stubs), the transcript of the deposition of Lifestar's vice-president, and the FAC before setting forth an analysis and summary of the data in her declaration. Also, a portion of the time and pay records (including Martinez's 24 pay stubs) was attached to the declaration of Woodward, Lifestar's attorney. Woodward analyzed that portion of the records and created a table of the 10 types of bonuses paid to the first 27 employees in the pay records.

Martinez contends the trial court failed to consider all the evidence presented in connection with the motion. Because reversible error is shown on another ground, we do not resolve this claim of error. We note, however, the parties did not challenge the *admissibility* of the factual assertions in the declarations or of the documents attached to the declarations. For instance, Martinez made no evidentiary objections to the time and pay records attached to Woodward's declarations or to Woodward's analysis and summary of that data. Similarly, Lifestar made no evidentiary objections to the analysis of the pay data contained in the declaration of Fulimeni, Martinez's expert. Consequently, the pay data attached to Woodward's declaration and the analyses of the pay data provided by Woodward and Fulimeni are part of the evidence properly considered in our review of the class certification motion.

### 2. *Martinez's Claim and the EMS Bonus*

The following is a point-by-point description of the facts underlying Martinez's claim that are established by the evidence, and are not disputed by Lifestar.

First, Martinez was an employee of Lifestar, like the putative class members. This fact is both undisputed and supported by the evidence. Martinez's declaration states he worked as an EMT for Lifestar from September 2019 until July 2020. Woodward's declaration confirms this fact by stating his client's pay records show Lifestar employed

Martinez for approximately 10 months from September 2019 to July 2020. In addition, Martinez's 24 pay stubs were attached to Woodward's declaration and show payments made from September 2019 to July 2020.

Second, Martinez's base hourly wage in 2020 was $13.00. Every pay stub from 2020 lists his "EMT Hourly" rate at $13.00. In comparison, his 2019 pay stubs show his "EMT Hourly" rate was $12.00.

Third, Martinez received an "EMS Bonus" in May 2020 and it was the only bonus he received during his 10 months working for Lifestar. Neither party contends otherwise. The supporting evidence includes a separate pay stub dated May 19, 2020, showing Martinez received an "EMS Bonus" at the rate of $109.47 and, after withholdings, his net pay was $100. The pay stub corroborates the testimony of Lifestar's vice-president stating she believed Martinez received an EMS bonus for National Emergency Medical Services Week, which is the third week in May, and "our EMTs got a hundred dollars." In addition, Woodward reviewed Lifestar's pay data and stated in his declaration that "[t]he only bonus [Martinez] was ever paid was the EMS Bonus." Woodward's statement confirms Martinez was paid an EMS Bonus and adds the fact that it was Martinez's only bonus. The additional fact is confirmed by our review of his 24 pay stubs. They include only one bonus—the EMS Bonus paid in May 2020. His final pay stub shows the year-to-date amounts for the following categories of earnings: (1) EMT Hourly, (2) EMT Overtime, (3) EMT Premium, (4) EMT Double-time, (5) EMT Sick, and (6) an EMS Bonus in the amount of $109.47. No other type of bonus is listed and the amount reported for the EMS Bonus is the same as the amount reported on his May 19, 2020 pay stub. To summarize, the undisputed evidence shows the only bonus Martinez received from Lifestar was the $109.47 EMS Bonus paid in May 2020.

Fourth, Martinez's EMS Bonus was not factored into the pay rate used to calculate his overtime, double time, and premium pay. This fact is established by his pay stub for

the May 10, 2020, to May 23, 2020 pay period, which lists his hourly rate at $13.00, his overtime rate at $19.50, his double time rate at $26.00, and his "EMT Premium" rate at $13.00. The overtime and double time rates are exactly 1.5 and 2 times the $13.00 base "EMT Hourly" rate on that pay stub (and all of Martinez's 2020 pay stubs). Consequently, simple math establishes that the *regular rate of pay* actually used to compute the amount of the overtime, double time, and EMT Premium paid for the May 10, 2020 to May 23, 2020 pay period was the same as Martinez's base hourly rate. It necessarily follows that Martinez's May 19, 2020 EMS Bonus was excluded from the regular rate of pay. The fact that the EMS Bonus was excluded from the calculation of Martinez's regular rate of pay is corroborated by Lifestar's vice-president's testimony that Lifestar did not include any bonuses paid to class members when determining their overtime rate.

To summarize, Lifestar does not contest the foregoing facts and also acknowledges Martinez's claim is based on the legal theory that he was underpaid in violation of the Labor Code because the "regular rate of pay" (Lab. Code, § 510, subd. (a)) used to calculate his overtime, double time, and premium pay was based on his straight hourly wage and excluded his EMS bonus. Lifestar contests Martinez's claim on the ground that the law allows the EMS Bonus to be excluded in calculating Martinez's regular rate of pay because the bonus was in the nature of a gift, in recognition of services, or both and, therefore, was discretionary. (See DLSE Manual, § 49.1.2.4, subds. (1), (3).)

### 3. Claims of the Class Members

The following facts about the class claims are derived from the time and pay data produced by Lifestar in discovery and the analyses of that data presented by expert Fulimeni and Woodward. The summary in Fulimeni's declaration states (1) she examined data for 135 employees; (2) there were 1,217 employee pay periods in which a

bonus was paid; (3) all the pay periods with a bonus included pay for overtime or double time; and (4) 1,133 (93 percent) of the 1,217 pay periods with a bonus included remuneration for a meal premium.

After examining the pay codes used by Lifestar for the various types of compensation paid, Fulimeni prepared a table titled "Pay Code Summary" that contained four columns labeled "Pay Code," "Employees," "Pay Periods," and "Amount." Ten of the pay codes included the word "bonus." Those pay codes and the number of employees reported by Fulimeni as receiving that type of bonus are, in alphabetical order: Bonus (41), Clerical Bonus (6), EMS Bonus (52), Lead Bonus (7), Manager Bonus (8), Paramedic Bonus (11), Preceptor EMT Bonus (25), Preceptor Paramedic Bonus (15),[2] Recruitment Bonus (8), and Sign On Bonus (8). These numbers total 181, which means that some of the 135 employees in the data set were paid more than one type of bonus. Fulimeni's table shows the EMS Bonus was paid to more employees than any of the other nine bonuses. Those 52 employees are approximately 30 percent of the putative class of 135 employees.

The EMS Bonuses, when ranked by the number of pay periods in which the bonus was paid, dropped to fifth place, behind the Manager Bonus (522 pay periods), Lead Bonus (254 pay periods), Preceptor EMT Bonus (242 pay periods), Preceptor Paramedic Bonus (110 pay periods), and the generic pay code "Bonus" (107 pay periods). The 86 employee pay periods in which the EMS Bonus was paid accounts for approximately 7 percent of the 1,217 pay periods Fulimeni identified where both a bonus and overtime were paid.

---

[2] Preceptor bonuses are paid to the paramedic or EMT who oversees and trains an intern during a shift. Interns are students who, as part of their paramedic or EMT course work, are assigned to an ambulance.

Fulimeni addressed potential damages by estimating the possible underpayment of overtime and double time totaled $462,450. This estimate of the overtime and double time allegedly owed was based on a calculation of regular rates of pay that incorporated the 10 types of bonuses paid. Applying the same approach to meal premiums received in a pay period with a bonus, Fulimeni identified a possible underpayment of $31,969.

Additional information about the class claims is contained in Woodward's declaration and the attached exhibits, which include the table he created showing the frequency with which the 10 types of bonuses were paid to 27 employees (i.e., a sample of about 20 percent of the class). The table identified each bonus paid by using a four-digit number that corresponded to the Bates number given a page produced in discovery. Each such page was a copy of the pay stub containing the bonus. For example, the first bonus listed in the table was placed in a column labeled "EMS" and designated with the number 1557. The page with Bates number LA_AM001557 was a May 19, 2020 pay stub for an employee whose name was redacted. It indicated the employee received an EMS bonus in the amount of $54.73, which resulted in net pay of $50. The second bonus identified in the table also was an EMS Bonus and the corresponding May 19, 2020 pay stub stated the amount was $109.48, which resulted in net pay of $100.

Woodward's table contained Bates numbers for 35 EMS Bonuses. These bonuses were paid to 14 (about 52 percent) of the 27 employees included in the table and 10 of those employees, including Martinez, received their EMS Bonus in May 2020. The other four were paid an EMS Bonus in various months of 2024, which suggests those payments were not related to National Emergency Medical Services Week and Lifestar's use of that pay code changed at some point.

During her deposition, Lifestar's vice-president testified about one of the EMS Bonuses paid in 2024 that was not related to National Emergency Medical Services Week. The $209 EMS Bonus was included in a paramedic's pay stub for the November

17, 2024, to November 30, 2024 pay period. She confirmed the bonus was not for National Emergency Medical Services Week and stated it was calculated on "how many calls he ran from the time he began his employment until this pay … period." When asked how to differentiate between that EMS Bonus and the one Martinez received, the vice-president referred to the timeframe, stating the bonus for National Emergency Medical Services Week occurs in May and the paramedic's bonus "is December so it's per call"—that is, it was based on "the total number of calls throughout the year."

The appellate record does not contain all pay stubs for all 1,217 pay periods in which both a bonus and overtime were paid to an employee by Lifestar. As a result, we cannot definitively state how many of the bonuses identified with the "EMS Bonus" pay code related to National Emergency Medical Services Week and how many were paid for a different reason. This lack of certainty as to a precise number of EMS Bonuses that, like Martinez's, were paid in connection with National Emergency Medical Services Week is not critical to the issues decided in this appeal because the record establishes that many of the EMS Bonuses paid to putative class members had that characteristic. (See pt. III.B., *post*.)

### 4. Applying the Typicality Test

The test of typicality asks (1) whether other members have the same or similar injury, (2) whether the action is based on conduct which is not unique to the named plaintiffs, and (3) whether other class members have been injured by the same course of conduct. (*Kizer v. Tristar Risk Management* (2017) 13 Cal.App.5th 830, 847; see *Patz v. City of San Diego* (2025) 113 Cal.App.5th 225, 294, quoting *Seastrom v. Neways, Inc.*, *supra*, 149 Cal.App.4th at p. 1502; 4 Witkin, Cal. Procedure (6th ed. 2021) Pleading, § 288, p. 364.)

These elements of the typicality test are met in this case. Martinez and the class members have the same injuries—the underpayment of overtime, double time, and

premium pay and the lack of accurate wage statements.  In addition, the claims of Martinez and the class members are based on Lifestar's conduct that is not unique to Martinez.[3]  That course of conduct is Lifestar's exclusion of bonuses from its computation of the employee's regular rate of pay.  (See *Schroeder v. Envoy Air, Inc.* (C.D.Cal., Aug. 30, 2017, No. CV 16-4911-MWF (KSx)) 2017 WL 3835804, p. *1 [motion for class certification granted as to the overtime subclass; the district court concluded whether the bonuses defendant awarded its employees must be included in their regular rate for purposes of calculating overtime was susceptible to class treatment].)  This course of conduct was (1) described in Lifestar's vice-president's testimony that Lifestar did not include bonuses when it calculated the employees' regular rate of pay and (2) confirmed by pay stubs showing both the payment of a bonus and the payment of overtime at a rate 1.5 times the employee's straight time hourly rate during the same pay period.  Therefore, the evidence establishes a course of conduct—excluding a bonus from the calculation of the regular rate of pay—that caused the alleged injuries of both the class members and Martinez.

Consequently, the *claims* satisfy the three elements of the typicality test.  We note that Lifestar's contentions could be interpreted as implying that the group of claims based on EMS Bonuses is not typical of the proposed class's claims, which address all 10 types of bonuses.  We reject that contention based on the foregoing application of the typicality test, which demonstrates why courts often remark that "the test for typicality is not

---

[3]      The adjective "unique" means "being the only one : SOLE."  (Webster's Third New Internat. Dict. (1993) p. 2500.)  The noun "unique" means "the only one of its kind <mistaking the [unique] for the typical – W.J. Reilly>."  (*Ibid*.)  Black's Law Dictionary does not separately define the word "unique" but defines "unique chattel" to mean:  "A chattel that is absolutely irreplaceable because it is one of a kind."  (Black's Law Dict. (12th ed. 2024) p. 296.)

demanding." (*Mullen v. Treasure Chest Casino, LLC*, *supra*, 186 F.3d at p. 625; see 1 Newberg and Rubenstein on Class Actions, *supra*, § 3:29.)

B.  Unique Defense

Our analysis of the typicality of Martinez's claim proceeds to the *defenses or arguments* raised by Lifestar.  "[A] proposed class representative's claim may not be typical if it is subject to a so-called 'unique defense' that does not apply to the other class members' claims."  (1 Newberg and Rubenstein on Class Actions*, supra*, § 3:45 [presence of unique defenses].)  One court described the concept of a unique defense as a "defense peculiar to the named plaintiff or a small subset of the plaintiff class."  (*CE Design Ltd. v. King Architectural Metals, Inc.* (7th Cir. 2011) 637 F.3d 721, 726.)  In comparison, where "a defendant mounts a defense general across the whole class, that defense will not render the class representative's situation atypical as it applies to her no differently than it does to the rest of the class."  (1 Newberg and Rubenstein on Class Actions*, supra*, § 3:45.)  The unique defense principle reflects the concern that the " 'plaintiff will become distracted by the presence of a possible defense *applicable only to him* so that the representation of the rest of the class will suffer.' "  (*CE Design Ltd.*, *supra*, at p. 726, italics added.)

Here, the trial court stated there was "significant possibility exists that [Martinez] would be uniquely subject to a defense based on the DLSE Manual's 'gift' type, special occasion bonus exclusion (§ 49.1.2.4, subd. (1)) or its exclusion for '[s]ums paid in recognition of services performed' that are paid solely in the discretion of the employer (§ 49.1.2.4, subd. (3))[.]"  Paragraph (1) of section 49.1.2.4 of the DLSE Manual identifies certain payments that are excluded in determining the regular rate of pay:

> "Sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours

worked, production, or efficiency; (Discussed in 29 C.F.R. § 778.212)."

Paragraph (3) of section 49.1.2.4 of the DLSE Manual identifies another exclusion:

> "Sums paid in recognition of services performed during a given period if either, (a) both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly . . . .  (Discussed in 29 C.F.R. §§ 778.211 and 778.213)."

The statement that there was a significant possibility Martinez would be *uniquely subject to a defense* based on these provisions constitutes legal error because it misinterprets the term "unique" as it is used in the context of typicality.  The exclusion of Martinez's EMS Bonus from his regular rate of pay is far from unique—that is, the only one of its kind—because other EMS Bonuses paid during the class period were excluded from Lifestar's determination of the employee's regular rate of pay.  The time and pay data produced in discovery shows 51 other employees were paid a bonus identified with the "EMS Bonus" pay code and those bonuses were received in 85 employee pay periods.  Lifestar's vice-president testified that none of the bonuses were included in calculating the employees' regular rate of pay.  Thus, Lifestar's argument that EMS Bonuses paid during the National Emergency Medical Services Week were in the nature of a gift or a payment that was solely in its discretion applies to all such bonuses and is not a one-of-a-kind argument or defense affecting only Martinez's claim.  The fact that the record does not contain enough information to show precisely how many of the EMS Bonuses were related to National Emergency Medical Services Week and how many were paid for other reasons does not undermine our conclusion that Lifestar's argument is not unique to Martinez's EMS Bonus.  The table and pay stubs attached to Woodward's declaration addressed about 20 percent of the employees in the putative class and showed that 10 of the 14 employees who received an EMS Bonus received that bonus in connection with

24.

National Emergency Medical Services Week. Thus, Woodward's sample confirms that Lifestar's argument for exclusion applies to many other EMS Bonuses and, thus, is not unique.[4]

The legal error in the trial court's stated reasons for concluding Martinez's claim fails the typicality requirement requires reversal. During oral argument, counsel suggested the trial court's determination could be interpreted as a finding of fact and upheld because it was supported by substantial evidence. Even if interpreted as factual finding, we cannot accept the court's determination of the lack of typicality because it is not supported by substantial evidence. Rather, the time and pay data produced by Lifestar in discovery and analyzed by Fulimeni and Woodward compels the opposite finding when the correct legal standards are applied.

C.      Appellate Relief

Martinez's contention that the trial court should have certified the class proposed by him suggests this court should remand with directions for the trial court to grant the class certification motion. (See generally, §§ 47, 906 [power of reviewing court].) We recognize that this type of appellate relief is sometimes granted in class certification appeals. (E.g., *ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 312 ["matter remanded for certification of classes as set forth in this opinion"]; *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 241 [remand with directions to grant motion for class certification]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1539 [remanded with directions to certify subclasses]; *Medrazo v. Honda of North Hollywood, supra*, 166 Cal.App.4th at p. 102 ["trial court is directed to certify the class"]; *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 139 ["trial

---

[4]      Because there was no unique defense, we do not reach the next question in the typicality analysis, which is "whether, and to what extent, the defenses are likely to distract from common issues." (4 Witkin, Cal. Procedure, *supra*, Pleading § 291, p. 366, citing *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1090.)

court is directed to certify two subclasses"]; *National Solar Equipment Owners' Assn. v. Grumman Corp.* (1991) 235 Cal.App.3d 1273, 1286 [trial court "directed to vacate its order denying certification and to enter an order granting certification"].)

Here, in light of the deference given to trial courts considering class certification and the number of criteria that do not overlap with typicality and were not addressed in the trial court's stated reasons, we conclude the better course is to remand the matter for further consideration of the class certification motion in light of this opinion. (See *Martinez v. Joe's Crab Shack Holdings*, *supra*, 231 Cal.App.4th at p. 384 [denial of class certification reversed, and the cause remanded for proceedings not inconsistent with the opinion].) The analysis conducted on remand may include whether to narrow the proposed class or whether to create subclasses for one or more types of bonuses.

## DISPOSITION

The March 25, 2025 ruling denying the motion for class certification is reversed. The matter is remanded for further proceedings on the class certification motion that are not inconsistent with this opinion. Appellant shall recover his costs on appeal.

FRANSON, J.

WE CONCUR:

HILL, P. J.

HARRELL, J.

26.